JaGOTHARD, Judge.
Claimant, Charlotte Mack, appeals a decision by a hearing officer of the Office of Workers’ Compensation. The judgment recognized claimant’s right to consult an orthopedist of her choice. Additionally, the judgment found that the rate of compensation paid to claimant was correct and that no refund was due to the employer, and that defendant was not subject to penalties for arbitrary and capricious conduct.
The record shows that Charlotte Mack was a long time employee of River Oaks Psychiatric Hospital. She returned to work on February 1, 1992 after a five-month leave of absence for an unrelated illness. On that day she was attending to her duties as psychiatric attendant in the sexual trauma ward. She explained that part of job was to insure the safety and comfort of the patients on the ward by dispensing razor blades from a locker as needed for the personal | ghygiene of the patients. She was returning the razor blades to the locker when the accident occurred. As she stooped in front of one of the lockers, making a note of the time the razor blades were returned, the entire row of lockers fell over on her, pinning her to the floor. One of the patients who witnessed the accident screamed for help, alerting hospital personnel who came to Mrs. Mack’s assistance. She was taken by ambulance to Elmwood Medical Center where she was treated and released by an emergency room doctor.
She returned to Elmwood for three physical therapy sessions as instructed, seeing a different doctor each time. On February 12, 1992 Mrs. Mack returned to the emergency room at Elmwood Medical Center, because the therapy sessions were not helping her recovery, and because the pain had intensified and localized in her knee, neck and back. At that time she was seen by Dr. Mark Allain. After conducting an examination and taking x-rays of Mrs. Mack’s hands, legs, and arms, Dr. Allain referred his patient to Dr. Chad Millet, an orthopedic surgeon. Dr. Al-lain called and made the appointment with Dr. Millet for the same day. As instructed, Mrs. Mack went to Dr. Millet’s office for an examination on that day and also on February 20, 1992 for a follow-up exam.
Mrs. Mack retained counsel shortly afterward, and on his advice did not return to Dr. Millet. Instead she went to see Dr. Kenneth Adatto in March of 1992. She was treated by Dr. Adatto on four occasions, but stopped seeing him on May 7, 1992 when River Oaks failed to agree to pay for an MRI ordered by Dr. Adatto.
A disputed claim for compensation was filed and the matter proceeded to hearing. At the hearing the claimant testified to the facts of the injury and the ensuing treatment. She related that she returned to work full time on the day of 14the accident at the rate of $5.49 per hour. She verified that she received weekly compensation from the date of the injury until March or April, 1992; however, she could not be sure of the amount of the weekly compensation. On cross-examination she admitted she received $117.12 per week, but was confused over the amount because she allowed her attorney to take his fee out of the check first.
She stated that the pain in her back was serious enough to prevent her from returning to work in any capacity. Mrs. Mack further testified that she saw Dr. Millet twice, but became distrustful of him after the second visit because he told a representative from River Oaks that he released Mrs. Mack for light duty on February 12, 1992; the same day he told Mrs. Mack that she was totally disabled. Consequently, when asked to report to work the next day she refused and retained counsel.
Dr. Mark Allain testified by way of deposition introduced into evidence. He stated that he saw Mrs. Mack on her first follow-up visit to Elmwood. He saw her again on the 12th of February. Her condition had worsened. He received word from physical therapy that she had not responded to treatment because her complaints of pain rendered it impossible to conduct the physical therapy sessions. Because Dr. Allain is a family *1084 physician seeing patients on an emergency basis, he felt that the time had come to send her to a specialist. He selected Dr. Chad Millet and called to make an appointment with Dr. Millet for Mrs. Mack the same day.
The record contains the deposition of Dr. Chad Millet, who stated that he first saw Mrs. Mack on February 12, 1992 when she was referred to him by Dr. Allain of Elm-wood Medical Center for evaluation of the pain in her left knee, neck and back. Dr. Millet testified that in the course of the examination, he | 5noted that she had a straight leg raise on the left at seventy degrees with some posterior thigh pain which may have indicated evidence of sciatica. However, other tests conducted tended to negate that theory. She was also noted to have minimal tenderness to palpation of the paraspinal muscles of the lumbar spine and did not have any evidence of spasm. An examination of her neck revealed normal motor strength and reflexes. There was some tenderness in her left knee, but no obvious effusion or swelling in the joint. Her knee was found to be stable on examination and she had a negative McMurray test, which denotes no meniscal or cartilage tear.
Dr. Millet also reviewed the x-rays taken at Elmwood and found no acute or chronic bone changes. In conclusion, Dr. Millet opined that Mrs. Mack had an acute cervical strain, acute lumbar strain and tenderness in the left knee. To rule out a medial meniscal tear, Dr. Millet ordered an MRI of the knee. That procedure was conducted on February 20, 1992 and showed normal results. Dr. Millet stated that Mrs. Mack returned to his office on February 24, 1992. At that time she reported to him that her left knee pain had subsided but she still had back and neck pain. She continued taking Lodene, an anti-inflammatory drug prescribed for her by Elmwood. Dr. Millet’s examination showed some mild tenderness over the paraspinal muscles with no evidence of spasm, as well as some minimal tenderness in the paraspinal muscles of the lumbar spine. Further, the exam showed no evidence of sciatica or nerve root impingement. In conclusion, the doctor stated that he found no objective symptoms of injury to Mrs. Mack and recommended that she continue a physical therapy rehabilitation program for her neck and back symptoms for about two weeks and return for a follow-up visit after that. As to her ability to work, Dr. Millet felt that Mrs. ftMack could perform light duty job' requirements with restrictions on heavy lifting, and excessive stooping and bending. In response to questioning, Dr. Millet stated that Mrs. Mack would not have medical difficulties performing clerical work.
Mrs. Mack did not return to Dr. Millet in two weeks as instructed. She returned on November 5, 1992 at the request of counsel for River Oaks. At that time Mrs. Mack informed Dr. Millet that she had consulted Dr. Kenneth Adatto, who tried to schedule an MRI of her lumbar spine. She told Dr. Millet that she had low back pain, as well as pain in both legs. She also stated that she had occasional numbness in both legs when she remained seated for a long period of time. Dr. Millet repeated his earlier exams and found no acute distress. Mrs. Mack was able to ambulate with a normal gait. Motor strength was normal and there was no der-matomal distribution noted. She was able to sit up and fully extend her legs without any difficulty and there was no obvious muscular atrophy noted in her lower extremities. Dr. Millet found no objective symptoms of continued injury to Mrs. Mack. His impression was that she had low back pain and occasional leg pain, and he thought she would benefit from an aggressive physical therapy program for back and abdomen muscle strengthening.
Dr. Millet disagreed with Dr. Adatto that an MRI of the lumbar region was indicated. He stated that she needed no further workup because she had no obvious nerve root impingement which would warrant an MRI. He also stated that thermograms or range of motion analysis are not accepted in the medical orthopedic specialty at this point and he would not advise conducting those tests. Dr. Millet opined that Mrs. Mack could return to work with no physical restrictions.
l7Christopher Brocato, the loss control coordinator for Universal Health Services, testified that his job entails the initial investigation and handling of employee accidents for River Oaks. He stated that his review of *1085 Mrs. Mack’s personnel file revealed that she returned as an employee of River Oaks in January 1992, after a leave of absence. At that time her status was changed from “LOA”, or leave of absence to “PRN”, or per diem status. He explained that an employee with a “PRN” status was “on call” when needed. Her rate of pay was the same as it was before the leave of absence, $5.49 per hour.
Mr. Broeato testified that the hospital authorized payment for Elmwood Medical Center directly, but he authorized treatment by Dr. Millet. Mr. Broeato asserted that the hospital had not selected Elmwood as its choice. Elmwood had merely been the closest hospital able to provide Mrs. Mack with immediate care. He denied having any involvement with the selection of Dr. Millet, and further stated that the hospital did not chose Elmwood or Dr. Millet. He maintained that the selection of physicians after the initial visit to the emergency room at Elmwood was Mrs. Mack’s personal choice.
Mr. Broeato stated that he called Dr. Millet’s office on February 12, 1992 because he had a modified duty program at the hospital which would provide Mrs. Mack with employment at the same rate of pay. Mr. Broeato got approval from Dr. Millet’s office for modified duty. Mr. Broeato stated that he called Mrs. Mack on that same day and told her about the position and the approval by Dr. Millet’s office. Mrs. Mack indicated to Mr. Broeato that she was unable to work in any job and that she had a letter from Dr. Millet verifying that fact. Mr. Broeato requested that Mrs. Mack forward a copy of the letter to him and he called Dr. Millet’s office again to verify the information. After the followup Igvisit to his office on February 20, Dr. Millet again informed Mr. Broeato that Mrs. Mack was capable of doing the modified duty work and the job was again offered to Mrs. Mack. She still refused to report to work and, in fact, at the time of trial had not returned. Mr. Broeato testified that the modified duty work is still available to Mrs. Mack.
Mr. Jimmy Robiehaux, an account manager with F.A. Richard & Associates, third party administrators who investigate claims and handle compensation and liability claims for self-insured companies, testified at the hearing. F.A. Richard was selected by Mr. Broeato to be the third-party administrator of the claim brought by Mrs. Mack. Mr. Robiehaux testified that, because of the conflicting statements as to Mrs. Mack’s ability to work, compensation was not paid until March 11, 1992. The check issued at that time represented a lump sum payment of compensation due retroactive to February 9, 1992. After that she received $117.12 per week until March 31, 1992 when benefits were terminated because claimant failed to return to work after Dr. Millet released her for light duty work. Mr. Robiehaux testified that he was informed that Mrs. Mack was working on a per diem basis so he used the daily rate provision in the Workers’ Compensation Act, which requires consideration of a twenty-six week earning period predating the accident, to compute the weekly rate. Additionally, all mileage costs submitted for reimbursement were paid with the exception of the mileage submitted for transportation to Dr. Adatto’s office. Mr. Robiehaux also stated that authorization for treatment by Dr. Adatto was denied, because the investigation revealed that Dr. Millet was Mrs. Mack’s chosen orthopedic surgeon.
| ¡¡The claimant introduced into evidence the narrative of Dr. Kenneth Adatto. In that narrative Dr. Adatto stated that he evaluated Charlotte Mack on March 19, 1992. He recorded that she complained of pain in her lower back, leg, and knee. She further stated that she was suffering from muscle weakness and numbness. She had neck pain and right arm discomfort with numbness and tingling, as well as some weakness in her hand, and headaches. Dr. Adatto conducted an examination of the cervical spine which revealed a mild spasm at rest and stress without tilt and scoliosis. He noted a full range of motion in the upper extremities and normally functioning cranial nerves.
Examination of the lumbar spine also revealed spasm at rest and stress without tilt and scoliosis. Mrs. Mack also had a normal range of motion in this area, and motor, power and sensation were intact in the lower extremities.
*1086 Dr. Adatto’s final conclusion was that Mrs. Mack had a relatively fresh cervical and lumbar syndrome with symptoms in both areas, more in the low back than the cervical spine. She also had a bruising reaction of the left knee. Dr. Adatto recommended that she have further diagnostic tests including an MRI and a thermogram. His prognosis was guarded and he stated that she was totally disabled until the results of the tests were received. As stated earlier, the tests were never conducted because payment was not authorized.
In four assignments of error to this court, claimant contends the hearing officer failed to establish the weekly compensation rate, and failed to decide whether the defendant should pay temporary total disability benefits after the judgment. Further, claimant argues that the hearing officer failed to order the payment of bills for services rendered by claimant’s physician.
| ipThe first argument regarding the correct rate of compensation has no merit. Although claimant argues in brief that she only received $79.00 per week, there is sufficient testimony to show that she received compensation at the rate of $117.12 per week. It is clear from the judgment that the hearing officer considered the established rate of compensation to be correct. Therefore, there was no need to establish a new rate of compensation.
In connection with this assignment of error claimant also argues that the rate was incorrectly calculated.
LSA-R.S. 23:1021(10) defines wages and provides in pertinent part that:
“Wages” means average weekly wage at the time of the accident. The average weekly wage shall be determined as follows:
(a) Hourly wages.
(i) If the employee is paid on an hourly basis and the employee is employed for forty hours or more, his hourly wage rate multiplied by the average actual hours worked in the four full weeks preceding the date of the accident or forty hours, whichever is greater;
[[Image here]]
(d) Other wages. If the employee is employed on a unit, piecework, commission, or other basis, his gross earnings from the employer for the twenty-six week period immediately preceding the accident divided by the number of days the employee actually worked for the employer during said twenty-six week period and multiplied by four; however, if such an employee has worked for the employer for less than an twenty-six week period immediately preceding the accident, his gross earnings from the employer for the period immediately preceding the accident divided by the number of days the employee actually worked for the employer during said period and multiplied by four.
Defendant used section (d) of the above statute to calculate the rate of compensation. Claimant argues the hearing officer should have considered her to be a full time employee working for an hourly wage and used section (a)(i).
I nThe defendant introduced the claimant’s 1991 time cards and payroll records into evidence. They show that the claimant’s work schedule varied. There were weeks in which she worked only 20 hours and weeks in which she worked 40 hours. Also introduced into the record is a portion of the personnel file. Those documents indicate that Mrs. Mack had a telephone conversation with Gail Simpson, the hospital’s personnel director, on January 23, 1992 to discuss the terms of her return to work after the leave of absence. In the course of that conversation Mrs. Mack turned down the hospital’s offer of full time employment, preferring to return on a per diem basis. Her reason for not accepting the full time job was that she intended to keep her full time job with the School Board. In her testimony Mrs. Mack confirmed that she was working two jobs at the time of the accident, the one herein at issue, and as a teacher’s assistant with the Jefferson Parish School Board. A form dated that next day shows that Mrs. Mack’s status was changed from leave of absence to per diem.
It was determined that the appellant had worked 20 days during the previous 26-week period and that her gross wages for those *1087 days equalled $878.40. That amount was divided by 20 resulting in a daily rate of $43.92. Her daily rate times four is $175.68. Two-thirds of that average weekly wage yielded the compensation rate of $117.12.
The records are somewhat misleading because of the fact that Mrs. Mack went on leave of absence in September of 1991, began negotiations for her return in January, 1992, and sustained this injury on the first day of her return in February of 1992. Nevertheless, given the testimony and documentary evidence presented, the finding of the hearing officer that she returned on an as needed, per diem basis, paid by the hour is a reasonable conclusion.
| i2Findings of fact by the trial court are subject to review under the manifest error standard. Rosell v. ESCO, 549 So.2d 840 (La.1989). Given the evidence introduced at trial we cannot find error with the hearing officer’s conclusion that the compensation rate used was correct.
In her next assignment of error, the claimant argues that the hearing officer erred in not ordering the defendant to pay for treatment by Dr. Adatto. In brief claimant asserts that there is a balance due of $995.00 on Dr. Adatto’s fee and that the trial court should have ordered defendant to pay that amount to Dr. Adatto, because it was established at trial that claimant had a right to choose her orthopedic surgeon.
Defendant counters that argument by pointing out that claimant did not mention doctor bills from Dr. Adatto at trial and none were introduced into evidence. Consequently, defendant maintains that it is not responsible for Dr. Adatto’s bills.
We believe that the failure to submit evidence of the medical expenses related to Dr. Adatto’s treatment is not ruinous of claimant’s right to compensation. In Foreman v. West Calcasieur-Cameron Hospital, 625 So.2d 1104, at 1109 (La.App. 3 Cir.1993), writ denied, 631 So.2d 450 (La.1994), a defendant challenged the judgment of a hearing officer in which the defendant was ordered to pay all related outstanding medical bills. The court found that the language of the judgment “merely affirms the plaintiffs right to assert her claim for any medical benefits arising as they might .become due”. See also, Broussard v. Grey Wolf Drilling Co., 562 So.2d 1006 (La.App. 3 Cir.1990), writ denied, 567 So.2d 102 (La.1990); Johnson v. Acadian Contractors, 590 So.2d 623 13(La.App. 3 Cir.1991), writ denied, 591 So.2d 700 (La.1992); Anderson v. Eagle Asbestos Co., 355 So.2d 1082 (La.App. 4 Cir.1978).
We find that pursuant to LSA-R.S. 23:1203 the claimant’s right to claim medical expenses is always reserved to him, even though the defendant’s liability arises only when they are incurred. Campbell v. Luke Construction Co., 543 So.2d 1032 (La.App. 3 Cir.1989). We believe that the trial court erred in not awarding claimant compensation for services rendered by Dr. Adatto, as well as transportation costs in connection with visits to his office and amend the judgment to order the defendant to pay such bills upon presentation.
In her next assignment, the claimant asserts that the hearing officer erred in failing to state whether defendants should pay temporary total disability benefits to claimant, after judgment was rendered giving her the right to see Dr. Adatto.
The issue of whether Mrs. Mack’s benefits were correctly terminated is a factual issue within the purview of the hearing officer and must be reviewed using the manifest error standard. Rosell v. ESCO, supra. The manifest error standard of appellate review applies to the court’s findings of fact, whether they are based upon live testimony or written evidence. Virgil v. American Guar. & Liability Ins., 507 So.2d 825 (La.1987), on remand 520 So.2d 1259 (La.App. 5 Cir.1988); Pinkins v. Cardinal Wholesale Supply, 608 So.2d 248 (La.App. 5 Cir.1992), reversed on other grounds 619 So.2d 52 (La.1993). The hearing officer considered medical evidence from both Dr. Millet and Dr. Allain, as well as the narrative from Dr. Adatto. From the rulings in the judgment it is obvious that the hearing officer accepted Dr. Millet’s me'dical findings and rejected those of Dr. Adatto. Given the evidence presented we can find no manifest error in Juthat decision. Further, because we find *1088 the benefits were terminated appropriately, we find defendant is not liable for failure to approve the MRI and other diagnostic tests ordered by Dr. Adatto.
The final assignment of error challenges the hearing officer’s finding that the defendant was not arbitrary and capricious and the denial of claimant’s request for attorney’s fees. We must consider the defendant’s behavior in two aspects to properly consider claimant’s assignment of error. First, the failure to pay Dr. Adatto’s fees and second, the failure to pay benefits subsequent to the report by Dr. Millet that claimant was capable of working.
LSA-R.S. 23:1201.2 subjects an employer to Lability for penalties and attorney’s fees if a failure to pay just compensation is found to be arbitrary, capricious or without probable cause.
LSA-R.S. 23:1121(B) allows a claimant to seek treatment with one physician of his choice:
B. The employee shall have the right to select one treating physician in any field or specialty. After his initial choice the employee shall obtain prior consent from the employer or his worker’s compensation carrier for a change of treating physician within that same field or specialty. The employee, however, is not required to obtain approval for change to a treating physician in another field or specialty.
It is clear from the testimony that Mrs. Mack was taken to Elmwood simply because it was nearby and she needed emergency care. There was no evidence offered to show that either the defendant or the claimant chose the treatment center or the doctor initially. It is the position of the defendant that Mrs. Mack could have chosen not to return to Elmwood after she was treated and released in the emergency room on the day of the accident. They argue that once | 15she chose to return and consult Dr. Millet, an orthopedic surgeon, she made him her chosen specialist.
It is the claimant’s position that she only went to Dr. Millet on two occasions on the referral of Dr. Allain and had never been to him before; thus, he was not her chosen physician. She asserts that River Oaks called an ambulance to take her to Elmwood and she thought of Dr. Millet as the company doctor. After she went to him twice she decided to seek treatment from Dr. Adatto.
The decision by the hearing officer to allow Mrs. Mack to choose her own treating physician was not challenged by appeal and we will not comment on its correctness. However, we do believe the defendant could have had a valid belief that the Dr. Millet was not a company doctor and was chosen by Mrs. Mack. That fact is sufficient to defeat Mrs. Mack’s claim for damages arising from arbitrary and capricious behavior on the part of the defendant.
Because we have found nothing erroneous in the rulings of the hearing officer on the issues of the rate and duration of compensation benefits paid by the defendant, we find no manifest error in the finding that the defendant was not arbitrary and capricious in this regard.
For the foregoing reasons we amend the judgment of the hearing officer to order the defendant to pay all costs incurred by the claimant for services rendered by Dr. Adatto and transportation costs connected with this treatment upon presentation in accordance with this decision. In all other respects the judgment of the hearing officer is affirmed.
AMENDED AND AS AMENDED AFFIRMED.