SUSAN M. CHEHARDY, Judge.
 

 12This is a worker’s compensation claim for back injury. Jeannie Redmann appeals a judgment that denied her claim for medical benefits and weekly compensation for lower-back surgery prescribed for her. The trial court found the claimant failed to carry her burden of proving that her current problem is connected to the work-related incident. We affirm.
 

 PROCEDURAL HISTORY
 

 Redmann was an employee of Martin Wine Cellar (hereafter “Martin”) when she sustained a back injury at L5-S1 in January 2006. She was paid compensation and medical benefits, and was off work for several months. Although she eventually returned to work, in January 2007 Martin terminated her employment because she could not perform her job duties. She continued to receive worker’s compensation wage benefits for some time afterward.
 
 [1]
 

 On January 18, 2008 Redmann filed a Disputed Claim for Compensation against Martin.
 
 [2]
 
 She listed the date of injury as January 7, 2006, and described the accident as follows: “Claimant suffered immediate injury to lower back while handling products in cheese cooler.” As disputed items she listed wage benefits, Roosts, penalties, interest, and attorney’s fees. Red-mann sought payment of additional benefits and medical expenses for treatment of lower back pain in the L3-4 area, although the problems for which she had been treated in the months after the 2006 accident were at L5-S1.
 

 
 *43
 
 The case was tried in July 2009 and judgment was rendered in September 2009. The Office of Workers’ Compensation judge found that Redmann sustained injury to her L5-S1 disc on January 7, 2006, during the course and scope of her employment with Martin Wine Cellar, but that Redmann failed to prove connexity between the 2006 injury and the L3-L4 injury for which she currently seeks benefits. The judge refused to approve surgery for Redmann, but found that Martin had failed to controvert Redmann’s need for treatment and diagnostic tests, including the EMG, epidural steroid injections, and the selective nerve blocks, on a reasonable and timely basis. The judge assessed penalties and attorney’s fees against Martin in the amount of $8,000 each.
 

 Redmann has appealed. She asserts the Office of Workers’ Compensation judge erred in finding her current injury not related to her prior injury when her treating surgeon related it to the prior injury, and there is no history of other accident or injury. She argues the judge erred in failing to apply the presumption that this injury was caused by the 2006 accident where no intervening accident was shown, and the medical evidence establishes a reasonable possibility of causal connection.
 

 Martin asserts the judgment is correct.
 
 [3]
 

 EVIDENCE
 

 At trial Martin stipulated to Redmann’s employment status and to the following facts: an accident occurred on January 7, 2006; there was an initial |,(injury from that accident; the claimant’s average weekly wage was $1,202.92; and the maximum compensation rate at the time was $454.00 per week.
 

 The only live testimony was from the claimant. The parties filed in evidence, as joint exhibits, medical records from Dr. Scott Simeon, Dr. Alexis Waguespack, Dr. J. Monroe Laborde, Dr. Gary Glynn, Dr. Donald Dietze, Dr. William Johnston, and The Movement Science Center, as well as depositions of Dr. Dietze and Dr. Johnston.
 

 Jeannie Redmann testified she began working as the deli/catering manager at Martin Wine Cellar in June 1999 and remained in that position until January 17, 2007. She said Martin terminated her employment because her back was not getting better and they needed someone to run the deli.
 

 Redmann said she never had back problems prior to the accident in 2006. She had the accident on a Saturday and she went to the doctor the following Monday. She could barely walk. She underwent X-rays and an MRI. Her primary care physician, Dr. Scott Simeon, told her she needed to see a back doctor.
 

 Redmann saw Dr. Alexis Waguespack, an orthopedic surgeon, who recommended an epidural injection for pain relief. Red-mann testified she was not able to return to work at that time, but spoke to Jill Baraloux, Martin Wine Cellar’s human resource manager. Baraloux advised Red-mann she was being placed on medical leave. Approximately two weeks after the accident Redmann was contacted by the worker’s compensation insurance administrator.
 

 Redmann was not able to get the epidural injection until seven months after the accident, because the worker’s compensation administrator would not approve it. Redmann said the claim representative for the worker’s compensation administrator told her that they considered the injection
 
 *44
 
 medically unnecessary. The claim representative would not put the denial in writing, however. Redmann |fisaid she repeatedly phoned the claims representative, Amanda Majors, but Majors did not return her calls. She estimated she made more than two dozen calls to Majors.
 

 Redmann stated the injection in July 2006 provided relief only for a day or two at most. Dr. Waguespack recommended a second epidural, but it was never approved by the worker’s compensation administrator. Redmann testified that after she received the epidural injection, Dr. Waguespack said her back would not have worsened if she had been allowed to have the injection at the beginning.
 

 Redmann was off work due to the back injury from January 2006 through May 2006.Martin continued to pay her full salary. In May 2006 Dr. Waguespack released her to part-time light-duty work, and she returned to work. While she was working part-time she received checks from the worker’s compensation insurer.
 

 Following the July 2006 injection by Dr. Waguespack, Redmann said, she was told there was nothing more that Dr. Wagues-pack could do for her. Redmann believed Dr. Waguespack meant that the worker’s compensation administrator was refusing to pay for further treatment.
 

 Thereafter the worker’s compensation administrator sent Redmann to Dr. J. Monroe Laborde for a second opinion. After the consultation with Dr. Laborde, Dr. Waguespack received approval for the epidural injection.
 

 Redmann testified she later sought treatment on her own from Dr. Gary Glynn, because she was still having severe problems. She had returned to work part-time. Dr. Glynn was unable to help her, however.
 

 In January 2007 Martin sent her to Dr. William J. Johnston, a neurologist. Red-mann said there was no problem getting the worker’s compensation administrator to approve the visit to Dr. Johnston. Dr. Johnston ordered three tests — a myelo-gram, a nerve-conduction study, and a CT scan — but the worker’s | (¡compensation insurer approved only the myelogram. Red-mann said Dr. Johnston told her that he was aggravated nothing was being approved and that she wouldn’t even be there if the worker’s compensation insurer had approved her treatment in the beginning. Redmann said the worker’s compensation insurer refused to approve an MRI ordered by Dr. Johnston, but sent her back to Dr. Waguespack and approved an MRI ordered by Dr. Waguespack.
 

 Redmann underwent the second MRI in 2007. She liked Dr. Johnston and would have liked to continue being treated by him. After the myelogram was performed, Dr. Johnston recommended she see a Dr. Knight for pain management and physical therapy. However, the insurer never approved treatment by Dr. Knight.
 

 Subsequently Redmann was treated by Dr. Dietz, who recommended surgery in 2008, but the surgery was not approved by the worker’s compensation insurer.
 

 Redmann said all the doctors — Wagues-pack, Johnston, and Dietz — told her the surgery would help with the pain and, without the surgery, her condition would continue to worsen. Redmann felt her condition had worsened due to the lack of treatment over the years.
 

 Redmann said she has prescription pain medication, but uses it as little as possible because it makes her “loopy and sleeping and unable to function.” She testified that at the time of trial she was still receiving worker’s compensation benefits checks.
 

 
 *45
 
 Counsel for Martin elicited testimony establishing that Redmann, although not working, maintains a busy schedule volunteering at her children’s schools, driving their school earpool; and driving to their sports activities; that she has been on several lengthy automobile trips for family vacations; that she is able to swim, |7to clean her house, and do volunteer work for friends who opened a small business. She is able to walk a mile for exercise, and to sit or stand for three hours at a time.
 

 Redmann stated, however, that there are days when she is unable to do these activities because of back pain. She stated she was not in court claiming she could not do anything, but rather simply seeking medical treatment. She believes her present problems are related to the accident at Martin Wine Cellar, because there has been nothing in between that could have caused them.
 

 She stated she realized how limited she was due to her injury when she attended a football game and climbing the stadium stairs caused her back to go into spasm. She said the only reason Dr. Waguespack considered her to be at MMI (maximum medical improvement) was because the worker’s compensation insurer was denying her further treatment.
 

 The medical records show that following the MRI on January 12, 2006, Redmann’s initial injury was diagnosed as “degenerative changes in the lower lumbar spine including a posterior annular tear and bulge at L5-S1,” with “borderline nerve root contact in the left L5-S1 exit foramen with no other areas of'potential nerve root contact detected.” She was certified as disabled from work.
 

 Dr. William J. Johnston, a neurological surgeon, stated in his deposition he initially saw Redmann on January 12, 2007, on referral from Dr. Gary Glynn. He reviewed two MRIs. The first, from January 2006, showed “a central disc prolapse ... a retrolisthesis with SI anterior on L5.”
 
 [4]
 
 He recorded no findings at the L3-4 level. The symptoms Redmann reported to him in January 2007, a year after that MRI, were consistent with an L5-S1 disc problem.
 

 Dr. Johnston testified that because Red-mann’s radicular symptoms seemed to be typical of those involving the left SI nerve root, implicating the disc or some 1 sproblem at the L5-S1 disc level, he recommended further studies consisting of an EMG (electromyogram), myelogram and a CT scan, with some routine medications. When he saw her in March 2007, her symptoms still were consistent with an L5-S1 problem. After that visit he recommended a myelogram and CT scan. He saw her again a few weeks later to review the results of the diagnostic testing, but could not identify a neurologic explanation of her symptoms. He stated that the L5-S1 level was also negative — he could identify no nerve root compression at that level.
 

 Dr. Johnston saw Redmann again in June 2007, at which time she told him she had been off all her medicines and had done well until she climbed stairs at a football game and after that had increasing low back pain.
 

 In November 2007 Dr. Johnston discharged Redmann from his care, recommending she see her primary physician for symptomatic treatment of musculoskeletal back pain. He could identify no new neu-rologic impairment or deficits that would suggest a surgical lesion.
 

 
 *46
 
 In May 2008 Redmann returned to Dr. Johnston, complaining of pain in the L3-4 distribution area. Dr. Johnston described it as a different distribution than the L5-S1 pain. The new pain involved her groin, the dermatome in the part of the leg more typically supplied by the L3 and L4 nerve roots, clearly different from that subserved by the SI nerve root. What she was describing seemed to be a different level of radicular pain. Dr. Johnston recommended another MRI to investigate the new problem.
 

 The second MRI was performed on May 28, 2008. After reviewing it, Dr. Dietze recommended an anterior L3^i discectomy and artificial disc replacement with possible interbody fusion at L3-4. Dr. Johnston testified he would not ^recommend a procedure of the magnitude proposed by Dr. Dietze without substantial documentation of a change from what he saw on the myelogram.
 

 Dr. Johnston said there had been a change between the date of the myelogram he ordered on March 15, 2007, and the second MRI in May 2008. He concluded that if Redmann has unstable retrolisthesis at L3-4 now, then it is not related to her accident in January 2006. He said that change could have been the evolution of degenerative disease, or it could have been a new injury.
 

 Dr. Donald Dietze testified in his deposition that he saw Redmann on December 8, 2008 and reviewed MRI scans from January 2006 and May 2008. His notes stated the 2006 MRI showed moderate L5-S1 disc disease, with broad-based disc protrusion, and the L3-4 disc had minimal spon-dylotic changes. His report noted, “There clearly has been progression of disc disease at L3-4 between 2006 and 2008 MRI scans .... 2006 lumbar MRI demonstrates NO L3-4 disc derangement. Therefore, it can be deduced that L3-4 disc pathology is directly related to her work injury.” He also stated, however, “I do not feel that her L5-S1 disc disease accounts for her radiculopathy.”
 

 In the deposition, however, Dr. Dietze concluded there was an event between the two MRIs that caused the L3-4 problem.
 

 LAW AND ANALYSIS
 

 A worker’s burden of proving personal injury by accident is not relaxed and must be shown by a preponderance of the evidence.
 
 Coats v. American Tel. & Tel. Co.,
 
 95-2670, p. 4 (La.10/25/96), 681 So.2d 1243, 1245.
 

 Because the rulings in the judgment were factual findings, the standard of review is manifest error.
 
 Mack v. River Oaks Psychiatric Hosp.,
 
 94-372, p. 13 (La.App. 5 Cir. 11/16/94), 646 So.2d 1082, 1087.
 

 JjThe trial court’s determinations as to ... whether the worker has discharged his or her burden of proof are factual determinations not to be disturbed on review unless clearly wrong or absent a showing of manifest error. Indeed, the manifest error/clearly wrong standard of appellate review applies in compensation actions even when the trial court’s decision is based solely upon written reports, records or depositions. [Citations omitted.]
 

 Bruno v. Harbert Intern. Inc.,
 
 593 So.2d 357, 361 (La.1992).
 

 In applying the manifest error standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one.
 
 Stobart v. State through Dept. of Transp. and Development,
 
 617 So.2d 880, 882 (La.1993).
 

 Applying these principles to the facts elicited at trial, we cannot say the Office of Workers’ Compensation judge was manifestly erroneous. Her conclusion
 
 *47
 
 that the claimant failed to carry her burden of proving connexity between the 2006 incident and her 2008 diagnosis of L3-4 problems is not clearly wrong. Rather, Redmann’s problems started with L5-S1 complaints, which improved, and the L3-4 condition developed later and was not persuasively established to result from the 2006 injury.
 

 DECREE
 

 For the foregoing reasons, the judgment is affirmed. Costs of appeal are assessed against the appellant, Jeannie Redmann.
 

 AFFIRMED.
 

 [1]
 

 . A document in the record indicates Red-mann was paid wage benefits until October 2009.
 

 [2]
 

 . Redmann’s claim form incorrectly called the company “Martin's Wine Cellar,” but the correct name is "Martin Wine Cellar.” The employer's proper name is David Y. Martin, Jr., Inc., which does business as Martin Wine Cellar. Also made defendant is the worker’s compensation insurer, Bridgefield Casualty Insurance Company.
 

 [3]
 

 . Martin did not appeal the assessment of penalties and attorney’s fees against it.
 

 [4]
 

 .
 
 Retrolisthesis
 
 is "a specific form of spondy-lolisthesis ... where the superior body slips backwards on the lower body. It's a misalignment of the bones.... ” Exh. 8, Deposition of Donald D. Dietze, M.D., pp. 33-34.